**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RICHARD F.,**            ) | |
|            ) | |
|       **Plaintiff,**      ) | |
|            ) | **No. 17 C 6552** |
|       **v.**           ) | |
|            ) | **Magistrate Judge Jeffrey Cummings** |
| **NANCY A. BERRYHILL, Acting**    ) | |
| **Commissioner of Social Security,**    ) | |
|            ) | |
|       **Defendant.**      ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard F. ("Plaintiff") seeks judicial review of a final decision of Defendant Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied plaintiff's application for disability insurance benefits and social security income initially on October 14, 2014 and upon reconsideration on May 11, 2015. (R. 12). An Administrative Law Judge ("ALJ") issued a written decision on February 15, 2017 that also denied plaintiff's claims. (R. 13-19). The Appeals Council denied his request for review on July 8, 2017, making the ALJ's decision the Commissioner's final decision. Plaintiff appealed the ALJ's decision to federal court on September 11, 2017 and consented to proceed before this Court on October 18, 2017 for all purposes, including final judgment. (Dckt. # 7). On May 4, 2018, plaintiff filed a motion for summary judgment seeking to reverse the Commissioner's decision. (Dckt. # 16). For the reasons discussed below, plaintiff's motion is granted.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age,

education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

## B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, --- S.Ct. ---, 2019 WL 1428885, at *3 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## C. Background Facts

Plaintiff complains of pain in his cervical spine, lumbar spine, as well as pain and numbness in his wrists. The relatively sparse record shows that plaintiff was first diagnosed with degenerative disc changes in his cervical spine in March 2011, when he was hospitalized for

neck pain. (R. 290-308). An x-ray showed moderately severe changes at the C4-C5 level. (R. 290). By July 2013, plaintiff was also diagnosed with osteoarthritis of the knee and was prescribed Celebrex. (R. 347). Notes from August 18, 2014 showed moderate pain in both knees that included numbness and tingling. Plaintiff also experienced a new onset of constant neck pain that was associated with numbness and tingling. (R. 367). By November 10, 2014, plaintiff complained of diffuse tenderness in his right knee and was prescribed Mobic. (R. 371).

Plaintiff was also diagnosed with carpal tunnel syndrome in his left wrist at the November 10, 2014 examination. (R. 372). His condition had worsened by January 7, 2015, and Plaintiff was given a Kenalog injection in his left hand on January 22, 2015 due to the "failure of conservative therapy." (R. 376-79). A knee x-ray from March 31, 2015 showed mild osteoarthritis of the bilateral knees with the right worse than the left. (R. 391). Plaintiff continued to complain of neck and lower back pain in May 2015 when an x-ray showed spondylolysis at L5 and narrowed disc spacing at L5-S1. (R. 417-18). The record does not show any improvement in plaintiff's carpal tunnel syndrome, which a January 19, 2016 notes states caused numbness in three of his left fingers. Plaintiff reported that the Kenalog injection had helped, but he wore a splint to relieve the pain in his left wrist. (R. 475).

Several medical experts issued opinions concerning plaintiff's condition. On September 23, 2014, Dr. M. S. Patil examined plaintiff at the request of the SSA. Plaintiff told Dr. Patil that the pain in his right knee was a ten on a scale of 1-10 and that it was a seven in the left knee. (R. 350). The pain in his neck radiated up into his head. Dr. Patil noted that plaintiff complained of "mild difficulty" in standing or walking more than five minutes at a time due to knee pain. (R. 350). His cervical range of motion was within normal limits, and plaintiff's strength was five out of five in all of his upper and lower extremities. (R. 351-52). Plaintiff demonstrated a normal

ability to walk in tandem, get on and off a table, squat, and walk on his toes and heels. (R. 352). Based on Dr. Patil's consultation report and the record, state-agency physician Dr. Charles Wabner found on October 3, 2014 that Plaintiff did not suffer from a severe impairment. (R. 59). Dr. Prasad Karenti agreed with that conclusion at the reconsideration stage on May 6, 2015. (R. 76).

On January 20, 2016, plaintiff's treating physician Dr. Sarah Hicks issued an expert report that included an RFC assessment. (R. 393-95). Dr. Hicks stated that she had been treating plaintiff since September 2015. She noted that he could not walk more than half a block without experiencing severe pain and that he was not able to take NSAID medications for pain relief. Plaintiff was only able to sit or stand for more than 20 minutes at a time before needing to move. He could also not sit or stand for more than two hours during an eight-hour workday. Plaintiff would therefore require the option of walking during his work period every 30 minutes for ten minutes at a time. Plaintiff would also require unscheduled breaks due to fatigue. Dr. Hicks included limitations related to carpal tunnel syndrome as well, stating that plaintiff would have "significant" limitations in reaching, handling, or fingering. This included an ability to reach overhead only 40 percent of the time during a workday, and grasp, turn, or twist objects 50 percent of the time. Dr. Hicks concluded that plaintiff's condition would create good days and bad days that would require him to miss work more than four days each month.

Plaintiff appeared before the ALJ at an administrative hearing on November 10, 2016. He testified that he stopped working as a security guard at an unspecified point in 2010 because he was in "constant pain" and could not walk (R. 37). Plaintiff described his condition as a slow deterioration that created pain in his lower back and both knees. (R. 37, "It's always there"). He wears a splint for his wrist, and uses a cane to walk on bad days. (R. 41, 50). Plaintiff stated that

he can only stand for ten minutes, walk 100 feet, and sit for ten to 15 minutes at a time. (R. 43-45). Carpal tunnel syndrome makes his fingers numb and prevents him from grasping with his left hand. (R. 49, "[I]t's horrible trying to do anything with it"). Plaintiff described his activities of daily living ("ADLs") as limited in nature. He can cook simple meals in his apartment if he has a chair to sit down on every five minutes, and friends help him with shopping. (R. 47). His social interactions are limited to going to dinners at the homeless shelter where he lived for a period of time after he stopped working in 2010. (R. 47-48).

### D.    The ALJ's Decision

The ALJ applied the five-step sequential analysis to conclude at step one that plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 29, 2013. (R. 15). Plaintiff's severe impairments at step two were degenerative disc disease and arthritis. (R. 15). Hypertension and carpal tunnel syndrome were found to be non-severe. (R. 15-16). None of plaintiff's severe impairments met or medically equaled a listing at step three either singly or in combination. (R. 16).

Before moving to step four, the ALJ considered plaintiff's statements concerning the severity and frequency of his symptoms, finding that the record did not fully support his claims. (R. 17-18). The ALJ also determined that plaintiff had the RFC to perform a full range of light work as defined by 20 C.F.R. § 404.1567(b). (R. 16). Based on this RFC, the ALJ found at step four that plaintiff could perform his past relevant work as a security guard. (R. 18). He therefore concluded that plaintiff was not disabled without moving to step five.

## II. Discussion

Plaintiff argues that substantial evidence does not support the ALJ's conclusions concerning the RFC assessment, the evaluation of his symptoms, or the report of treating physician Dr. Hicks. The Court addresses each of these claims in turn.

### A. The ALJ Failed to Build a Logical Bridge Between the Record and Claimant's RFC

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of ADLs; medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).[1]

The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the

---

[1] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id*.

claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id*.

The ALJ determined that plaintiff had the RFC to perform a full range of light work, which requires a person to lift ten pounds frequently and up to 20 pounds occasionally. 20 C.F.R. § 404.1567(b). "Frequently" is defined as between one-third and two-thirds of a workday; "occasionally" means up to one-third of the time. SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Light work also requires a "good deal" of walking or standing. 20 C.F.R. § 404.1567(b). SSR 83-10 defines that term as standing or walking "off and on, for a total of approximately 6 hours of an 8-hour workday" with periodic sitting. SSR 83-10, 1983 WL 31251, at *5. A claimant who can perform jobs at the light exertional level must be able to use his or her hands throughout the day. *Id*.

As noted, *supra* at pp. 4-5, several doctors issued conflicting reports about plaintiff's exertional capacity. The state-agency experts said that plaintiff did not have a severe impairment. That meant that he could work at all exertional levels. The ALJ rejected those opinions. (R. 18). Plaintiff's treating physician issued a report that imposed serious limitations on his ability to work, which the ALJ also rejected on the grounds discussed below, *infra* at pp. 17-21. (R. 18). That left the ALJ without any medical guidance on the work that plaintiff could undertake. The Commissioner construes plaintiff's argument to be that the ALJ erred by assessing the RFC without relying on an expert opinion. Plaintiff concedes, however, that a doctor's report is not mandatory because the RFC constitutes a legal – not a medical – decision for the ALJ to make. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide."). Instead, plaintiff argues that the ALJ did not consider all the relevant

medical and non-medical evidence and failed explain how that evidence supports each of the RFC findings as SSR 96-8p obligated him to do. An ALJ's failure to provide such a narrative explanation warrants remand even if the record supports the ALJ's ultimate decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Giebudowski v. Colvin*, 981 F.Supp.2d 765, 774 (N.D.Ill. 2013).

The Court agrees that the ALJ failed to build a logical bridge between the evidence and the RFC assessment. The Commissioner argues that such a bridge exists because the ALJ reviewed the record as a whole and cited specific findings about plaintiff's condition. The ALJ noted, for example, that x-rays taken in 2015 showed only mild knee osteoarthritis with minor changes in the lumbar spine.[2] (R. 17). He also pointed out that a June 2016 CT scan showed only grade 1 spondylolisthesis. (*Id.*). What the ALJ did not do, however, was to explain how those findings resulted in the RFC of light work instead of, say, medium work or some other RFC. The fact that the ALJ reviewed the record is not a substitute for his obligation under SSR 96-8p to explain "how the evidence supports each conclusion" and to build a logical bridge to the RFC assessment. SSR 96-8p, 1996 WL 374184, at *7. An ALJ "need not build the Pont Neuf" to construct such a bridge. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D.Ill. 2012). Despite the minimal burden that is required, however, an evidentiary summary is not sufficient when it leaves a court wondering how the ALJ derived a claimant's work abilities from data like x-rays and reports. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept.

---

[2] Plaintiff argues that the ALJ erroneously "played doctor" by interpreting x-rays on his own without medical guidance. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to [the] temptation to play doctor and make their own independent medical findings.") (citing cases). The Court disagrees that is what took place in this case. "Playing doctor" ordinarily arises when an ALJ either rejects a physician's conclusion without citing counter-evidence or when the ALJ draws medical conclusions without relying on evidence for it. *Armstrong v. Barnhart*, 287 F.Supp.2d 881, 887 (N.D.Ill. 2003). Here, the ALJ's review of the plaintiff's x-rays largely reiterated what the doctors who reviewed those images stated in their reports. An ALJ does not play doctor when she paraphrases or echoes the conclusions of a physician. *Brown v. Barnhart*, 298 F.Supp.2d 773, 791 (E.D.Wis. 2004).

26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of the RFC."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015).

The absence of such a narrative explanation is underscored in this case by the fact that the ALJ did not address everything that was relevant to the RFC issue. Plaintiff told the ALJ that he often needed to use a cane to help him walk. (R. 50-51). He particularly needed the cane after he had an active day (as might be expected by working on a full-time basis). (*Id.*). Plaintiff supported his testimony by stating that he could only walk 100 feet and stand for ten minutes though his ability to do so varied from day to day. (R. 43-45). He also claimed in his written ADL statements that he could only walk one-half of a block without needing to rest. (R. 232). The ALJ overlooked almost all of plaintiff's testimony, stating only that he claimed that he used a cane and "cannot be on his feet for long periods of time." (R. 17). The ALJ never said why plaintiff did not need a cane or why he could stand or walk up to eight hours a day with periodic breaks. That "is not a logical bridge; it is a soaring inferential leap." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). An ALJ is obligated to address a claimant's need for a cane, and the failure to do so constitutes reversible error. *See Thomas v. Colvin*, 534 Fed.Appx. 546, 550 (7th Cir. 2013); *McDonald v. Astrue*, 858 F.Supp.2d 927, 940 (N.D.Ill. 2012).

Plaintiff claimed along similar lines that he was only able to sit for ten to 15 minutes and needed to shift positions. (R. 46). He also testified that he needed a chair when he cooks so that he can sit down every five minutes. (R. 47). That suggests that plaintiff might have required a sit/stand option in order to work. Plaintiff's testimony was crucial to the RFC assessment

because a person who requires a sit/stand option cannot perform the full range of light work that the ALJ assessed:

> In some disability claims, the medical facts lead to an assessment of [an RFC] which is compatible with the performance of either sedentary or light work except that the person must alternative periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing . . . the prolonged standing or walking contemplated for most light work.

SSR 83-12, 1983 WL 31253, at *4. The sit/stand issue should have been a priority in the ALJ's assessment of plaintiff's functioning because the ALJ knew that his treating physician Dr. Hicks had included a sit/stand requirement in her expert report. Instead of addressing the issue, the ALJ overlooked everything that plaintiff testified to about his need to shift positions. That constitutes reversible error because an ALJ cannot "cherry-pick" evidence that supports a finding and ignore relevant parts of the record that are contrary to it, including a claimant's testimony. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *McDonald v. Astrue*, 858 F.Supp.2d 927, 940 (N.D.Ill. 2012).

The same reasoning applies to the ALJ's finding that plaintiff did not require any accommodation for his carpal tunnel syndrome. The ALJ found at step two that carpal tunnel syndrome constituted a non-severe impairment. The ALJ did not address anything this impairment at the RFC stage even though the RFC must assesses the combined impact of *all* of a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1523. *See Denton*, 596 F.3d at 423 ("A failure to fully consider the impact of non-severe impairments requires reversal."). Notwithstanding that oversight, the Commissioner argues that the ALJ adequately addressed the impact of this non-severe impairment because he noted at step two that plaintiff had received an injection to treat his symptoms and had not undergone an EMG or nerve conduction study or received follow-up care for carpal tunnel syndrome.

The Court disagrees with the Commissioner's reasoning on two grounds. First, courts have rejected an ALJ's reliance on the absence of an EMG study and follow-up care as proper supports for an RFC assessment that involves carpal tunnel syndrome. *Williams v. Colvin*, No. 13 C 34, 2014 WL 2118629, at *5 (N.D.Ill. May 21, 2014). As *Williams* points out, ALJs lack the medical expertise to determine if a claimant requires such tests, and citing their absence to support the RFC "impermissibly substitutes the ALJ's personal observations for the considered judgment of medical professionals" who did not recommend such care. *Id*., *quoting Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013). That is the case here. The ALJ did not call a medical expert to testify at the hearing, and he cited no evidence suggesting that any doctor thought that plaintiff needed an EMG study. Without such evidence, the ALJ had no ground for deciding whether a nerve conduction study and further treatment were necessary, or even appropriate, for plaintiff's condition. *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them.").

Second, the ALJ did not address most of the medical evidence relevant to the carpal tunnel issue. He said that plaintiff's condition was not serious because he had received an injection in his wrist. The ALJ seems to have thought that constituted conservative care, which can legitimately suggest that a claimant's impairments are not as limiting as he claims. *See*, *e.g.*, *Olsen v. Colvin*, 551 Fed.Appx. 868, 874-75 (7th Cir. 2014) (citing cases); *Colson v. Colvin*, 120 F.Supp.3d 778, 793 (N.D.Ill. 2015). The record shows that the opposite was true in this case. Dr. Eunice Kim noted that the injection was only given after the "*failure* of conservative therapy" for plaintiff's condition. (R. 378) (emphasis added). That included a referral to

physical therapy (which the ALJ failed to note) as well as a prescription for a wrist splint (which he also overlooked). (R. 372).

The ALJ's oversight of this issue is made worse by the fact that he also ignored what Dr. Kim said about plaintiff's carpal tunnel symptoms. Dr. Kim described numbness in the fingers of plaintiff's left hand that became worse with use. (R. 370, noting "a lot of intermittent electric shock type of feeling"). Plaintiff told the ALJ that he had difficulty in using his left hand to manipulate buttons or use a zipper, stating that "it's horrible trying to do anything with it." (R. 49). The ALJ noted some of plaintiff's claims on this issue, but he could not have properly accounted for their impact on plaintiff's ability to work without first noting what his treating physician stated.

The EMG study was not the only missing medical evidence that the ALJ relied on for the RFC. He also found that plaintiff could perform light work because he had failed to get medical imaging that his doctors had recommended. The Court is unable to follow the basis of the ALJ's reasoning on this issue. He cited a treatment note from Dr. Kim stating that plaintiff "wants to get xr done on the knees before he does knee injection[.]" (R. 17, 376). The Court assumes that this reference to Dr. Kim's note – which undermines the ALJ's point – was mistaken and that he intended to cite a follow-up entry stating that plaintiff had not had a knee x-ray as of March 18, 2015. (R. 384). Even presuming this assumption, the later note also undermines the ALJ's reasoning because Dr. Kim stated that plaintiff had not had the recommended x-ray "due to transportation issues." (*Id*.). The ALJ never considered if plaintiff – who had been homeless for a part of the period covered by the record – had problems getting to and from his doctors' appointments. That was erroneous because an ALJ is required to consider the reasons why a

claimant has not complied with treatment recommendations when deciding if the record supports the claimant's alleged limitations.[3] SSR 16-3p, 2017 WL 5180304, at * 9 (Oct. 25, 2017).

The ALJ further criticized plaintiff for not following his doctors' recommendation to take a higher dosage of medication and cited a December 10, 2014 note stating that plaintiff was unwilling to take 15 mg. of the anti-inflammatory medication Mobic. (R. 373). That reasoning fails for the same reason as the ALJ's claim that plaintiff refused to get a recommended x-ray. Plaintiff testified that he has an ulcer in his stomach that is made worse by taking Mobic. (R. 39). Two treating physicians confirmed that claim. (R. 372, 393). A claimant can have a good reason for not undergoing more aggressive treatment if the side effects of his medication are intolerable. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). By implying that plaintiff should have taken higher doses of Mobic, the ALJ disregarded Dr. Hicks' warning and erroneously substituted his own conclusion for her expert opinion. *See Thorps*, *v. Astrue*, 873 F.Supp.2d 995, 1005 (N.D.Ill. 2012) ("Of course, an ALJ may not substitute his own judgment for a physician's without relying on other medical evidence on record.").

Finally, the ALJ supported the RFC assessment by referring to the September 23, 2014 consultation report of Dr. M. S. Patil. Dr. Patil found that plaintiff had a normal gait and showed a normal ability to walk in tandem, to walk on his heels and toes, and had a normal right-knee x-ray. (R. 17). Dr. Patil also stated that plaintiff could walk normally for 50 feet. (R. 352). As before, however, the ALJ did not explain what that had to do with the RFC assessment. The ALJ did not draw any link between Dr. Patil's report and the RFC. Certainly, the fact that Dr. Patil

---

[3] Plaintiff also told the ALJ that he had no medical insurance for a period of time, and that even after he obtained it, he experienced lapses in coverage due to problems in processing his reapplications. (R. 39-41). The ALJ was required, but failed, to consider if that limited plaintiff's ability to obtain care. *See Alesia v. Astrue*, 789 F.Supp.2d 921, 934 (N.D.Ill. 2011) ("Where the record contains evidence that a claimant cannot afford treatment, the ALJ must explore the claimant's ability to pay before relying on the lack of treatment to support an adverse credibility finding.").

stated that plaintiff could walk normally in tandem and on his heels and toes does not in itself translate into an RFC of light work. Plaintiff does not claim that he cannot walk evenly or that he is unable to walk on his toes or heels; rather, he alleges that he cannot walk on a sustained basis for more than short periods of time. The fact that plaintiff was able to walk 50 feet during Dr. Patil's examination does not address that issue. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (describing the ability to walk without a cane for 50 feet as a "brief excursion [that] hardly demonstrates an ability to stand for 6 hours"). Plaintiff does not allege that he can walk less than 50 feet. He claims that he cannot walk more than 100 feet at a time. Neither Dr. Patil nor the ALJ ever addressed that issue.

The ALJ also failed to note a conflict in the record created by the report. The ALJ correctly stated that Dr. Patil found that plaintiff's knees were normal. (R. 17). That was because Dr. Patil reviewed an x-ray attached to his report stating that plaintiff showed "no acute abnormality" in his knee (R. 352). But plaintiff had already been diagnosed with knee arthritis by July 3, 2013, over one year prior to Dr. Patil's examination, and was given Celebrex to treat his symptoms. (R. 347). Subsequent imaging taken in March 2015 confirmed the 2013 diagnosis. (R. 391). These inconsistent test results constitute a conflict in the medical record that the ALJ was required to resolve before citing Dr. Patil to reject plaintiff's testimony. "An ALJ . . . is not only allowed to, he must, weigh the evidence, draw appropriate inferences, and, where necessary, resolve conflicting medical evidence." *Thorps*, 873 F.Supp.2d at 1005 (citing *Young*, 362 F.3d at 1001). The ALJ was not permitted to rely on Dr. Patil's report for the RFC assessment without first explaining how plaintiff's knee was normal in September 2014 when tests done in 2013 and 2015 showed arthritis.

Remand is therefore necessary so that the ALJ can consider all of the relevant medical and non-medical evidence and draw a logical bridge from the record to the RFC assessment.

**B.    The ALJ's Symptom Analysis Was Erroneous**

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it.  A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record.  *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).  An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms.  20 C.F.R. § 404.1529(c); SSR 16-3p.  When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record.  *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The ALJ determined that plaintiff's description of his symptoms was "not entirely consistent with the medical evidence and other evidence in the record."  (R. 17).  The parties dispute whether the ALJ's use of this language applied the appropriate standard for evaluating a claimant's symptoms.  Plaintiff correctly points out that courts have taken issue with the language that the ALJ used because it fails to explain what parts of a claimant's allegations were consistent with the record and what parts were not.  *See Dejohnette v. Berryhill*, No. 16 C 11378, 2018 WL 521589, at *5 (N.D.Ill. Jan. 22, 2018) (finding that the boilerplate phrase "not entirely consistent" makes "effective review . . . difficult or even impossible"); *see also Dunbar v.*

*Berryhill*, No. 17 C 6278, 2018 WL 4095094, at *3 (N.D.Ill. Aug. 28, 2018) (noting that objections to the kind of language the ALJ used "represents a new line of attack" in SSA cases that has not yet been widely adjudicated).

The Court declines to address this aspect of the ALJ's decision because the problems with the symptom analysis go far beyond the language that the ALJ used.  It is unclear what standard the ALJ used for the symptom issue because he never cited SSR 16-3p (which governs the topic) or the related criteria set out in 20 C.F.R. § 404.1529(c).  Indeed, the Court is unable to discern whether the ALJ even undertook a symptom analysis other than to state in a conclusory manner that the record did not support all of plaintiff's claims.  Instead of following up that conclusion with an evaluation, the ALJ immediately stated that "the objective medical evidence is consistent with a restriction to the full range of light work."  (R. 17).  That strongly suggests that the ALJ conflated the symptom evaluation with the RFC discussion.  The ALJ may have thought that the RFC could substitute for a symptom analysis because the two issues overlap in many ways.  *See Outlaw v. Astrue*, 412 Fed.Appx. 894, 807 (7th Cir. 2011) ("RFC determinations are inherently intertwined with matters of [symptoms analysis].").  Despite their similarity, however, conflating the two is erroneous because an ALJ is required to determine what parts of a claimant's symptom claims are supported by the record *before* assessing the RFC. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (stating that failing to undertake a symptom analysis before the RFC "gets things backward").

Even if the RFC analysis could serve as the symptom evaluation, substantial evidence does not support the ALJ's reasoning.  SSR 16-3p requires an ALJ to consider a claimant's medications and their side effects.  As noted, *supra* at p. 14, the ALJ criticized plaintiff because he refused to take higher doses of his anti-inflammatory medication and did not follow through

17

with a recommendation to have an x-ray taken. (R. 17). That does not support the ALJ's analysis because he failed to explain that the (at times homeless) plaintiff did not have health insurance for certain parts of his alleged disability period and overlooked that plaintiff was not able to take higher doses of the anti-inflammatory because he had an ulcer. (R. 39-40, 372, 393). SSR 16-3p instructs ALJs that a claimant's symptoms should not be found to be inconsistent with the record "without considering possible reasons he or she may not comply with treatment." SSR 16-3p, 2017 WL 5180304, at *9. That includes consideration of a claimant's ability to pay for care and the side effects of his medications. *Id*. at *10.

The ALJ's primary focus was on x-rays of plaintiff's knees and spine. The ALJ correctly noted that most of these x-rays showed only mild to moderate changes in plaintiff's joints, which led the ALJ to conclude that plaintiff's symptoms were not as severe as he claimed. The Court recognizes that objective medical evidence like x-rays or laboratory results are central to a symptom analysis, and SSR 16-3p requires ALJs to have such evidence when they find that a medically determinable impairment exists. Nevertheless, SSR 16-3p warns that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." *Id*. at *5. Courts have construed this to mean that an ALJ commits reversible error by "discounting pain testimony that can't be attributed to 'objective' injuries or illnesses – the kind of injuries and illnesses revealed by x-rays." *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *see also Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (explaining that x-rays are particularly limited as indicators of pain). If tests do not support a claimant's pain allegations, an ALJ is required to consider a claimant's ADLs "by directing specific inquiries about the pain and its effects to the claimant." *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

The ALJ considered plaintiff's testimony on these issues to some degree. He noted, for example, that plaintiff stated that he was in pain and could not stand on his feet for long periods; used knee braces and a cane; could lift ten to 15 pounds; and had trouble grasping items. (R. 17). Despite that, however, the ALJ never specifically addressed what it was in the record that conflicted with these claims. He also failed to note aspects of plaintiff's testimony on his limitations: plaintiff claimed that he used a wrist splint, needed to change positions frequently, and had the limitations in sitting, standing, and walking. The ALJ could not have built a logical bridge between the record and the symptom evaluation when he overlooked these allegations and failed to address most of the evidence concerning carpal tunnel syndrome. Remand is therefore necessary so that the ALJ can articulate the basis of his reasoning with greater care and build a logical bridge between the record and the symptom evaluation.

**C.      The ALJ Evaluation of the Treating Physician's Report Requires Remand**

On January 28, 2016, plaintiff's treating physician Dr. Hicks issued a report that included an assessment of his exertional capacity. Dr. Hicks stated that plaintiff could only walk one-half of a block due to pain; could sit and stand for 20 minutes at a time; but could only sit and stand for a total of two hours during a normal workday. (R. 393-94). Plaintiff would need to alternate periods of sitting, standing, and walking. (R. 394). He would also need to take unscheduled breaks every 15 to 20 minutes throughout the day. (R. 394). Dr. Hicks thought that plaintiff would experience good days and bad days that would require him to be off work for more than four days each month. (R. 395). In addition, the treating physician stated that plaintiff would have significant difficulties in reaching, handling, and fingering. He would be able to reach overhead only 40 percent of the time with both arms, could grasp items bilaterally 50 percent of the time and perform fine manipulation 50 percent of the time with his left hand. (R. 394).

A treating source opinion like Dr. Hicks' report is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). An ALJ must offer "good reasons" for discounting a treating physician's opinion. That involves assigning a specific weight to the report by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention. [4] 20 C.F.R. § 404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).

The ALJ assigned "little weight" to Dr. Hicks' report on the ground that the record, particularly plaintiff's x-rays, did not support her restrictions. (R. 18). Plaintiff argues that remand is required because the ALJ did not address all of the factors set out in the regulations for evaluating a treating source. The caselaw related to an ALJ's duty to consider the six regulatory factors is not entirely consistent. Some cases require strict compliance. *See*, *e.g.*, *Cambpell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Other are more forgiving. *See*, *e.g.*, *Schreiber v. Colvin*, 519 Fed.Appx. 951, 959 (7th Cir. 2013) (stating that an ALJ only needs to show that she "sufficiently accounted for the factors in 20 C.F.R. § 404.1527."). What the ALJ cannot do, however, is to overlook *all* of the regulatory factors when she weighs an expert report. If "the ALJ [says] nothing of the required checklist of factors," then remand is required. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

---

[4] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. § 404.1527c. For claims like plaintiff's that were filed before that date, the factors set out in 20 C.F.R. § 404.1527 continue to apply.

That is what took place in this case. Like the terms that guide a symptom evaluation, the ALJ did not cite the factors that govern a treating source opinion or refer to 20 C.F.R. § 404.1527 in his decision. He should have been aware that Dr. Hicks appears to have treated plaintiff longer and was more familiar with his condition than any other medical expert. The ALJ's only reason for dismissing the report was that "the record as a whole does not support such restrictions." (R. 18). For all the reasons discussed above, however, the ALJ did not properly explain how the record led him to this conclusion. That is especially true concerning plaintiff's alleged problems in using his hands. An RFC of light work requires the "use of arms and hands to grasp and to hold and turn objects." SSR 83-10, 1983 WL 31251, at *5. Dr. Hicks concluded that plaintiff would have significant problems in this area that would preclude light work. It was essential, therefore, that the ALJ explain what it was that led him to set aside Dr. Hicks' expert conclusions (as well as plaintiff's testimony) on this issue.

The Court does not find that the ALJ was required to accept Dr. Hicks' report or any of its separate findings. *See McMurtry v. Astrue*, 749 F.Supp.2d 875, 888 (E.D.Wis. 2010) (stating that an ALJ can give different weights to different findings in an expert report). Rather, he was obligated to explain the basis of his reasoning so that the Court can evaluate it on review. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." *Wates v. Barnhart*, 274 F.Supp.2d 1024, 1034 (E.D.Wis. 2003), *quoting* 20 C.F.R. § 404.1527(d). Remand is necessary so that he can reconsider the weight given to Dr. Hicks report by applying all of the factors set out in 20 C.F.R. § 404.1527.

### III. Conclusion

For the reasons stated above, plaintiff's motion for summary judgment [Dckt. # 16] is granted. The decision of the Commissioner is reversed, and the case is remanded for further

proceedings consistent with this Memorandum Opinion and Order.  On remand, the ALJ shall (1)

re-evaluate plaintiff's symptoms using the criteria set out in SSR 16-3p, (2) reassess the RFC,

and (3) reconsider the weight given to the treating source opinion.


**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  April 17, 2019**